AO-106 (Rev: 06/09)-Application for Search Warrant

# UNITED STATES DISTRICT COURT

for the

Northern District of Oklahoma

FILED

JUL 25 2023

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

| In the Matter of the Search of | ) |
|---|---|
| *a black Apple iPhone, Currently Stored at Tulsa Police* | ) |
| *Department at 1111 West 17th Street, Tulsa, Oklahoma* | ) |
| *74107* | ) |
| | ) |

Case No. 23MJ-405-MTS

**FILED UNDER SEAL**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment "A"

located in the ___Northern___ District of __Oklahoma__, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| **26 U.S.C. § 2119** | **Carjacking** |

The application is based on these facts:
**See Affidavit of SA Ben Nechiporenko, ATF, attached hereto**.

☑ Continued on the attached sheet.
☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SA Ben Nechiporenko, ATF
*Printed name and title*

Subscribed and sworn to by phone.

Date: 7-25-2023

_____
*Judge's signature*

City and state:  Tulsa, Oklahoma

Mark T. Steele, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **In the Matter of the Search of a black Apple iPhone, Currently Stored at Tulsa Police Department at 1111 West 17th Street, Tulsa, Oklahoma 74107** | Case No. _____ |

**Affidavit in Support of an Application
Under Rule 41 for a Warrant to Search and Seize**

I, Ben Nechiporenko, being first duly sworn under oath, depose and state:

**Introduction and Agent Background**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a federal law enforcement officer as defined under Rule 41(a)(2)(C) and am authorized to request this search warrant because I am a government agent who is engaged in enforcing federal criminal laws and I am within the category of officers authorized by the Attorney General to request such a warrant.

3. I have been employed as a Special Agent in Tulsa, Oklahoma since 2022. I am currently assigned to the Dallas Field Division, Tulsa Field Office with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). As a result of my employment with ATF, my duties include, but are not limited to, the

investigation and enforcement of illegals use, possession, and trafficking of firearms, criminal organizations and gangs, arson, and illegal use and possession of explosives.

4. Prior to my tenure as an ATF Special Agent, I was a sworn law enforcement officer employed with the West Fargo Police Department in North Dakota from October 2012 to January 2022. During my employment with the West Fargo Police Department, my primary assignments included: Patrol Officer with the Patrol Division, Detective for the Metro Street Crimes Unit with the Special Investigations Division, Task Force Officer and Team Leader with U.S. Marshals Service Violent Offender and Fugitive Task Force, and Patrol Sergeant with the Patrol Division. My training included over 1,250 hours of Police Officer Standards & Training (POST) approved training hours with an emphasis in gangs and narcotics enforcement. I served nine years with the Army National Guard as a Combat Engineer and received an Honorable Discharge at the rank of Sergeant. I received a Bachelor of Science Degree in Criminal Justice from North Dakota State University in 2011.

5. As part of my duties as an ATF Special Agent, I investigate criminal violations in the Northern District of Oklahoma to include Title 26 U.S.C. § 2119 - Carjacking.

6. I am familiar with the facts and circumstances of this investigation. The facts set forth in this affidavit are based on my personal observations, knowledge obtained from other law enforcement officers, my review of documents related to this investigation, conversations with others who have personal knowledge of the events and circumstances described herein, and a review of open-source information

including information available on the Internet. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact I or others have learned during the course of this investigation.

7. Based on my training, experience, and the facts set forth in this affidavit, there is probable cause to believe that evidence of violations of Title 26 U.S.C. § 2119 - Carjacking, as described in Attachment B and is recorded on the device described in Attachment A.

## Identification of the Device to be Examined

8. The property to be searched is a black Apple iPhone, hereinafter the "Device." The Device is currently located at the Tulsa Police Department Property Room at 1111 West 17th Street, Tulsa, Oklahoma 74107.

9. The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## Probable Cause

10. On July 12, 2023, at approximately 11:37am, Tulsa Police Department (PD) Officers were dispatched to the area of Western Pines Apartments, 2409 South Maybell Avenue, Tulsa, Oklahoma, 74107 for reports of "Shots Fired". The caller indicated a black male possessed an AR-style firearm and was discharging the firearm in the apartment complex.

11. Upon arrival, Tulsa PD Officers encountered the male, later identified as Rolland James MILES (DOB XX-XX-2002; SSN XXX-XX-9999). Tulsa PD Lieutenant J. Goldstein was among the first officers to arrive. Lt. Goldstein observed a white male (M.W.) and MILES.  At the time Lt. Goldstein observed them, M.W. was pointing at MILES. MILES initially ignored officer commands but was eventually detained without further incident.

12. Officers began an investigation and located two (2) shooting scenes. The first scene was in the parking lot of 2336 South Jackson Avenue where multiple cartridge casings were recovered, and it was determined rounds were discharged into Unit #36C. The second scene was on the west side of 2331 South Maybelle Avenue where a resident had video of MILES discharging a firearm. Tulsa PD Officers collected evidence and photographed the scenes.

13. Tulsa PD Officer Robertson recovered MILES' cellular telephone from the ground in front of 2331 South Maybelle Avenue. Tulsa PD Officer Rice recovered cartridge casings on the ground in front of 2331 South Maybelle Avenue. The items were entered into Tulsa PD evidence.

14. Tulsa PD Officer Grafton collected multiple cartridge casings in the parking lot of 2336 South Jackson Avenue. The cartridge casings were placed into evidence bags and transferred to Lt. Parsons. Officer Grafton located two (2) bullet holes in a north-facing exterior window for Unit #36C of 2336 South Jackson Avenue. Lt. Goldstein photographed the window. Officers conducted a welfare check of the apartment but did not locate any individuals, only a dog which was unharmed.

4

15. ATF Resident Agent in Charge (RAC) Williams arrived at Western Pines Apartments and spoke with Tulsa Police Lieutenant (Lt) Cox and Lt. Parsons who stated an individual had been taken into custody and a firearm was recovered. Lt. Cox indicated MILES would not tell officers his name, was claiming he was a tribal member of the Muskogee/Creek Nation. Lt. Cox and RAC Williams moved MILES from the back of a Tulsa Police vehicle and placed him in the front seat of RAC Williams' government vehicle. Lt. Cox and RAC Williams were going to attempt to interview MILES, however he would not give Lt. Cox and RAC Williams his name. MILES asked for Lt. Cox and RAC Williams to contact his attorney. MILES gave Lt. Cox a phone number to contact his lawyer and RAC Williams queried the name he gave, Justin Lile. The number given for the attorney did not match the number found during the search. Both Lt. Cox and RAC Williams attempted to contact the attorney. After several failed attempts, RAC Williams again tried to get MILES to identify himself and inquired if he needed an ambulance as he was acting erratic. MILES acknowledged he wanted an ambulance and RAC Williams requested one to the scene. RAC Williams asked MILES if he had taken any narcotics that could be causing him harm. MILES stated he had taken 30's (referring to 30 mg pills.)

16. Emergency Medical Services Authority (EMSA) arrived and assessed MILES in RAC Williams' vehicle. MILES refused to give his name or any information to the paramedic as well. After conducting the assessment, EMSA Paramedics advised RAC Williams that the MILE's heart rate was slightly elevated but that was to be expected with the heat and activity, and he did not need to go to the hospital.

5

17. RAC Williams sat with the MILES as he made insults and continued to attempt to contact his attorney. After a short time, Lt. Cox was successfully contacted the attorney's office. The recipient was placed on speaker phone and spoke with MILES. During the conversation MILES identified himself to the assistant as Rolland MILES. MILES was belligerent to the assistant as he had been with officer, EMSA, and RAC Williams.

18. RAC Williams searched tribal records for MILES status as a tribal member. The Muskogee/Creek Nation responded with a tribal certification for MILES and a role number #71162 with 1/128 degree of Creek blood. A criminal history was also requested, showing MILES has been arrested in both Edmond and Okmulgee Oklahoma but has no previous convictions. A check with Okmulgee Police Department for MILES revealed multiple contacts as a juvenile and an association with the Hoover Crip street gang.

19. During the time RAC Williams was with MILES, MILES made several utterances about how he had not committed a homicide and did not understand why he was arrested. On several occasions, MILES yelled at individuals in the complex that he needed medical attention, and he was being threatened. They occurred after EMSA assessed MILES and while in full view seated in the vehicle in the parking lot of the complex. A seat belt was placed on MILES after he started banging his head on the steering wheels honking the horn and kicking at the door.

20. S/A Mongell conducted an "Urgent Trace" through the National Tracing Center on the firearm recovered at the scene. The firearm is a Manufacturer:

Plumcrazy firearms/ET Arms, Model: Omega P-1, Caliber: multi, Type: pistol, Serial Number: EP00152. The firearm shows to have been purchased on June 9, 2023, from Dong's Sporting and Reloading Goods Inc. located at 4144 E Admiral Pl, Tulsa, Oklahoma by E.K.G. S/A Nguyen obtained a photograph of the firearm with the magazine removed.



21. As part of the investigation, it was determined that MILES had driven a blue 2015 Ford Focus from the apartment complex to a store near the scene and returned on foot. The blue 2015 Ford Focus, Vehicle Identification Number (VIN) 1FADP3F22FL287393, Oklahoma Creek Tribal License Plate H2R35 was registered to J.L. and/or C.W. of Okmulgee, Oklahoma 74447. The vehicle was impounded by Tulsa PD with a "No Touch Hold). The vehicle is located at Allied Towing of Tulsa, 2505 East King Street, Tulsa, Oklahoma, 74110.

22. After receiving the information of MILES' tribal status, RAC Williams transported MILES to the David L. Moss Criminal Justice Center and placed an ATF hold on him.

23. Tulsa PD Officers spoke with numerous witnesses who heard gunshots and saw a black male hide the firearm behind an air conditioning unit. Two of the witnesses, M.W. and R.V., who retrieved the firearm behind the air conditioning unit and provided it to law enforcement.

24. Tulsa PD Officers spoke with victim, B.B., who provided the following information:

- B.B. exited 2336 South Jackson Avenue, Unit #36C, to meet M.D. in the parking lot. M.D. was in a 2001 Chrysler PT Cruiser (OK/KHY862). M.D. told B.B. to get in the vehicle because there was a male (MILES) with a firearm. MILES approached and stated, "Open the door or I'll shoot you". MILES pointed the firearm at B.B. and discharged multiple rounds from the firearm toward the apartment building.

25. Tulsa PD Officers spoke with victim, M.D., who provided the following information:

- M.D. was in the parking lot in M.D.'s 2001 Chrysler PT Cruiser. M.D. observed a male with a firearm, and the male attempted to get into M.D.'s vehicle. The male discharged the firearm into M.D.'s apartment building and the ground in front of it.

26. Tulsa PD Officers spoke with victim, S.V., who provided the following information:

- S.V. was with M.D. as a passenger inside M.D.'s 2001 Chrysler PT
  Cruiser. S.V. and M.D. returned to 2336 South Jackson Avenue from the
  Western Pines Apartments office. As they returned to the apartment, they
  observed a black male standing by the apartment building with a firearm.
  B.B. came out to the vehicle, and M.D. told B.B. to get into the vehicle.
  The male approached the vehicle and told B.B. to unlock the door while
  pointing the firearm at B.B. The male discharged the firearm toward the
  apartment. M.D., B.B., and S.V. fled the parking lot.

27. On July 12, 2023, S/A Ben Nechiporenko and S/A Peggy Tobin Trice spoke
with employees of Western Pines Apartments, 2409 South Maybelle Avenue, Tulsa,
Oklahoma 74107. Employees, L.J. and M.L.  provided security camera video from
the complex. The video obtained was from all available cameras in the complex on
July 12, 2023, between the times of 11:00am to 12:30pm. S/A Nechiporenko also
received a map of the apartment complex which includes each building's address
number as well as the building's number designated by Western Pines Apartments.
S/A Nechiporenko marked a second copy of the map with camera locations and
channel numbers. It should be noted the cameras are motion activated. The time of
the video recording system appeared to be accurate.

28. On July 12, 2023, S/A Nguyen obtained security camera video from Jackson
Express Food Mart, 704 West 23rd Street, Tulsa, Oklahoma 74107. S/A Nguyen
provided the video on a flash drive to S/A Nechiporenko. S/A Nguyen also
provided photographs of the vehicle before it was impounded by Tulsa PD.

29. On July 13, 2023, S/A Nechiporenko reviewed video from Western Pines Apartments and Jackson Express Food Mart. Jackson Express Food Mart is located near the northeast corner of the Western Pines Apartment complex. Most of the cameras from Western Pines Apartments do not include a timestamp, but each video file is titled with the date and time it begins.



30. The following are notable events observed on various cameras. All events occurred on July 12, 2023.

- 11:22am - Jackson Express Food Mart

  - Rolland MILES arrives in a blue 2015 Ford Focus (Oklahoma – Creek Nation Tribal Plate H2R35, VIN: 1FADP3F22FL287393) and parks the vehicle.



- 11:29am – Jackson Express Food Mart

    - MILES exits the vehicle and walks south toward Western Pines Apartments.



- 11:34am – 2336 South Jackson Avenue (Building #36)

11

- M.D. and S.V. exit the apartment building and entered M.D.'s red 2001 Chrysler PT Cruiser (OK/KHY682). The two drive out of the parking lot.
- 11:40am – Western Pines Apartments
  - MILES walked southbound between Building's #38 & #39
- 11:42am – 2336 South Jackson Avenue (Building #36)
  - MILES is standing near the north side of the apartment building.
  - M.D. and S.V. return in the 2001 PT Cruiser and park.
- 11:43am – 2336 South Jackson Avenue (Building #36)
  - B.B. exits Unit #36C and meets M.D. at the vehicle.
  - B.B. enters the vehicle using the rear driver's side door.
- 11:44am – 2336 South Jackson Avenue (Building #36)
  - M.D., S.V., and B.B. begin to back out of the parking spot. MILES approaches the driver's side of the 2001 PT Cruiser with an AR-Style pistol in his right hand.

12



- MILES attempts to open the vehicle's door.

- 11:45am – 2336 South Jackson Avenue (Building #36)

  - MILES takes a step back, raises the firearm, and discharges multiple rounds of ammunition toward the apartment building.



  - MILES re-approaches the vehicle and grabs the door handle again.



- MILES walks back the to the rear of a light-color passenger car and appears to discharge the firearm again.



- M.D., S.V., and B.B. flee in the 2001 Chrysler PT Cruiser. MILES moves westbound and crouches behind a light-colored sport utility vehicle (SUV). While moving, MILES points the firearm toward the apartment building.
- 11:46am – Western Pines Apartments

14

- MILES runs westbound between Building #37 and #38 with the firearm in his left hand.

- 11:46am – 2332 South Jackson Avenue (Building #37)

  - MILES appears on the northwest corner of the building while carrying the firearm in his left hand. MILES appears to put the firearm in his waistband area. MILES walks to air conditioning units on the west side of Building #37. MILES appears to retrieve a cellular telephone from his clothing and use it until he continues walking westbound at approximately 11:49am.



- 11:50am – 2332 South Jackson Avenue (Building #37)

  - MILES walks westbound to the north side of 2331 South Maybelle Avenue (Building #30)

- 11:50am – 2331 South Maybelle Avenue (Building #30)

15

- MILES walks around the northwest corner of Building #30 toward to juvenile males. MILES is carrying the firearm in his right hand.



- MILES appears to hand one of the juvenile males and object with his left hand.



-

- 12:51am – 2331 South Maybelle Avenue (Building #30)

  - MILES was northbound, stops, and discharges multiple rounds of ammunition to the northeast. The juvenile males flee.

16



- MILES walks southbound in the direction the juvenile males fled.

- 11:51am – 2405 South Maybelle Avenue (Building #26)

  - MILES walks southbound to a patio door on the northeast side of Building #26. MILES is carrying the firearm in his right hand. MILES attempts to open the patio door.

- 11:51am – 2405 South Maybelle Avenue (Building #26)

  - M.W. exits patio door on the northwest corner of 2406 South Jackson Avenue, Unit #33D (Building #33).

  - R.V. exits patio door on northwest corner of 2405 South Maybelle Avenue, Unit 26A (Building #26).



17

- 11:53am - 2405 South Maybelle Avenue (Building #26)

  - MILES places firearm behind air conditioning unit as R.V. approaches. R.V. approaches MILES with his hands in the air. MILES and R.V. walk westbound and stop near R.V.'s patio door.

- 11: 55am - 2405 South Maybelle Avenue (Building #26)

  - M.W. walks westbound and retrieves the firearm from near the air conditioning units. M.W. runs back to his patio door. R.V. approaches M.W., and M.W. transfers the firearm to R.V. MILES walks southbound on the west-side of Building #26.

- 11:56am - 2405 South Maybelle Avenue (Building #26)

  - MILES returns walking northbound between Building #33 and #26. R.V. runs westbound with the firearm. MILES and M.W. walk northbound toward the south-side of Building #26.

- 11:57am – 2405 South Maybelle Avenue (Building #26)

  - MILES is encountered and detained by Tulsa Police Department Officers.



31. On July 19, 2023, I viewed video footage uploaded by a citizen. The video appears to view the westside of 2331 South Maybelle Avenue (Building #30). The video includes MILES appearing to hand his cell phone to a juvenile male. MILES walks to the north and discharges the firearm several times to the northeast. This location appears to be the same location MILES' cell phone was later recovered by Tulsa PD Officer Robertson.

32. On July 19, 2023, I spoke with Tulsa PD Officer Robertson. Officer Robertson stated while securing the scene, a citizen pointed to the Device which was on the ground and indicated it belonged to the shooter. Officer Robertson also noted two (2) juvenile males nearby.

### Technical Terms

33. Based on my training and experience, I use the following technical terms to convey the following meanings:

  a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals

19

through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic films. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This

storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using

21

specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated

by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

34. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online https://www.apple.com/iphone/, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA." In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### Electronic Storage and Forensic Analysis

35. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period on the device. This information can sometimes be recovered with forensics tools.

36. I know that cellular telephones are often equipped with digital cameras and those phones possess the capability to transmit and/or store electronic images. I know that in many cases, cellular telephones maintain photographs of illegal activities to include evidence of illegal possession of firearms, explosive devices, or materials used in the construction of explosive devices and the illegal purchase or acquisition of firearms, explosives devices, or materials used in the construction of explosive devices. These photos are sometimes stored in their cellular phones and often are transmitted or sent from one electronic media device to another. I also know that cellular phones may also contain notes regarding potential illegal acts that are recorded by the subject who possesses the electronics. Furthermore, I know that text messages, emails are often used by two or more persons to communicate information regarding the illegal possession or acquisition of firearms, explosive devices, or materials used in the construction of explosive devices and/or violent crime and other illegal activities, between principals and co-conspirators of those crimes.

37. I know that cellular telephones are utilized by most individuals in the United States and have become a staple of communication between individuals using text

messaging, visual and audible communications (telephone calls and FaceTime type communications) as well as applications like "Facebook Messenger". Additionally, individuals utilize their cellular devices to take pictures, keep notes, as a GPS (global positioning System) device, and even to conduct illicit or illegal activity. Communications on phones are kept for long periods and transferred from one phone to another when replaced. This is done using Cloud storage and direct transfer conducted at the time of purchase or by the individual themselves. Individuals utilize this method as not to lose data that is stored on the phone such as contacts, photos, notes, and other important information to the individual. This data includes contacts used to conduct illegal activities to include construction or assembly of illegal explosive devices.

38. Based on my training and experience, I know that individuals involved in criminal activity often use cell phones and other electronic devices to further their trade by conducting business on them via text messages and phone calls. Individuals involved in violent crime also trade images of firearms, explosive devices, or materials used in the construction of explosive devices and/or items from their illegal activity on their phone as well. I also know from training and experience that:

    a.  Cellular telephones are almost always used by persons engaging in criminal activities as a means of communication. They will communicate by verbal conversations, digital text messaging, and/or sending photographs to one another.

b.  Persons engaged in criminal activities carry and possess firearms or explosive devices during and in relation to and in furtherance of crimes. They also photograph themselves and others with controlled substances, firearms or explosive devices, and money proceeds. Such photographs are often kept in digital form on cell phones.

c.  Cellular telephones may also contain notes, emails, and text messages regarding money laundering, or inquiries for firearms, explosive devices, or materials used in the construction of explosive devices by the subject who possesses the cellular telephone.

d.  Text messages and e-mails are often used by two or more persons to communicate information regarding illegal activities between two telephones or between one telephone and a personal computer. This information can include directions for deliveries, stash locations, prices, cell phone contact numbers, and instructions.

e.  Cellular telephones often contain stored phone numbers and contact information of individuals that conduct business with other co-conspirators that possess the cellular telephone.

f.  Persons prohibited from legally possessing firearms or explosive devices frequently do not obtain them by a traditional means (such as through licensed dealers which require background checks and paperwork/documentation) and instead use third-party suppliers. Many of these third-party suppliers are online marketplaces such as Armslist

26

(www.armslist.com) or Gun Broker (www.gunbroker.com), or ordinary construction supply stores or gas stations in the case of homemade explosive devices, while other third-party transactions take place through the communication between two individuals in a private sale transaction, which takes place outside of the restrictions of the federal government that would at minimum document the sale or transfer.

g.  An additional avenue prohibited persons frequently use to obtain firearms is through the straw purchase of a firearm which is done when a non-prohibited person buys a firearm through traditional means for a prohibited person, at the direction of the non-prohibited person to include style, make, model, and caliber and sometimes even the individual to buy from. Frequently, this communication between the non-prohibited and prohibited person takes place via cellular device to include text messages with both instructions for purchase and pictures of firearms or explosive devices to be obtained or sold.

h.  Additionally, I know from my training and experience that many individuals who construct homemade explosive devices often conduct extensive research online regarding the needed materials and how to effectively assemble their desired explosive device. Internet history data found in cell phones is likely to show a record of a search history for instructions on explosives, as well as a history of visiting websites with information on the assembly of explosives and required materials.

27

     i.  In summary, prohibited persons frequently use cellular phones to obtain their illegally possessed firearms or explosive devices whether it be through third party web sites, private purchase, or through straw purchase.

38. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a

dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

39. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

40. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

41. *Methods of examination.* In conducting this examination, law enforcement personnel may use various methods to locate evidence and instrumentalities of the

crime(s) under investigation, including but not limited to undertaking a cursory inspection of all information within the Device. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with stored cellular device data, such as pictures and videos, do not store as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications associated with a cellular device, as it is impossible to know in advance all of the unique words or phrases investigative subjects will use in their communications. Consequently, often many communications in cellular device data that are relevant to an investigation do not contain any searched keywords.

## Conclusion

42. Based on the information above, I submit that there is probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

43. I request to be allowed to share this affidavit and the information obtained from this search with any government agency, to include state and local agencies investigating or aiding in the investigation of this case or related matters, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions from this matter.

Respectfully submitted,

Ben Nechiporenko
Special Agent
Bureau of Alcohol, Tobacco, Firearms
& Explosives

Subscribed and sworn to by phone on July 25, 2023.

MARK T. STEELE
UNITED STATES MAGISTRATE JUDGE

31

## ATTACHMENT A

### Property to be Searched

The property to be searched is a black Apple iPhone, hereinafter the "Device." The Device is currently stored at the Tula Police Department at 1111 West 17th Street, Tulsa, Oklahoma 74107.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.



**ATTACHMENT B**

**Particular Things to be Seized**

All records on the Device(s) described in Attachment A that relate to Title 18

U.S.C. § 2119 – Carjacking including:

1. Records relating to communication with others as to the criminal offense(s)
   listed above; including incoming and outgoing voice messages; text messages;
   emails; multimedia messages; applications that serve to allow parties to
   communicate; all call logs; secondary phone number accounts, including those
   derived from Skype, Line 2, Google Voice, and other applications that can
   assign roaming phone numbers; and other Internet-based communication
   media;

2. Records relating to documentation or memorialization of the criminal
   offense(s) listed above, including voice memos, photographs, videos, and other
   audio and video media, including Exchangeable Image File ("EXIF") data
   and any other metadata associated with those photos and videos, including
   device information, geotagging information, and information about the
   creation date of the audio and video media;

3. Records relating to the planning and execution of the criminal offense(s)
   above, including Internet activity, firewall logs, caches, browser history, and
   cookies, "bookmarked" or "favorite" web pages, search terms that the user
   entered into any Internet search engine, records of user-typed web addresses,
   account information, settings, and saved usage information;

4.  Application data relating to the criminal offense(s) above;

5.  Threating communications related to the criminal offense(s) listed above;

6.  Information related to co-conspirators, stash house locations used to store firearms, destructive devices, or materials used to construct destructive devices, admissions of criminal offense(s) related to the offense(s) listed above and information related to the acquisition or attempted acquisition of other destructive devices, components, firearms or ammunition in the future or already completed and related identifying information;

7.  Any information related to sources of acquiring destructive devices, components, firearms, co-conspirators, aiders and abettors of information related to the illegal possession of firearms as well as others (including names, addresses, phone numbers, or any other identifying information); information relating to instructions for transportation, obtaining and storing illegally possessed firearms, and information relating to means of transportation for illegally possessed destructive devices or firearms;

8.  All information, data, and photographs related to the possession, acquisition, and use of destructive devices, components, and/or firearms;

9.  All bank records, checks, credit card bills, account information, and other financial records.

2

10. Evidence of user attribution showing who used or owned the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, phone books, saved usernames and passwords, documents, and browsing history;

11. All records and information related to the geolocation of the Device(s) from June 12, 20223, to July 12, 2023;

12. All records and information related to the coordination, agreement, collaboration, and concerted effort of and with others to violate the criminal statutes listed above.

As used above, the terms "records" and "information" include all the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

3